FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

99 MAY 25 PM 4: 01

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| PAMELA BRODIE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs.- | ) | CV-97-P-3097-S |
| | ) | |
| THE CITY OF BIRMINGHAM, | ) | |
| and JOHN HACKETT, JR. individually | ) | |
| and in his official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

MAY 2 5 1999

## MEMORANDUM OPINION

The defendants filed their summary judgment motion on August 31, 1998. After the motion was considered at the November 13, 1998 motion docket, the court took the motion under submission. The defendants assert that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law in this racial discrimination and retaliation case. For the reasons expressed below, the court finds that the defendants' motion for summary judgment is due to be granted in full.

### Facts

The plaintiff, Pamela Brodie, is a white female employee of the City of Birmingham. Brodie began working for the City in 1973 and was eventually promoted to a secretarial job at the Legion Field Operations Office (as part of the Parks and Recreation Department) in 1989. At the time Brodie transferred to the Legion Field office there were no black persons or females working in the office. Brodie's initial supervisor at the Legion Field office was Ken Rotenberry, who retired less

39

than one year after Brodie's transfer. Rotenberry was replaced by a provisional supervisor, Walter Garrett, who remained in that position for approximately three years. Defendant John Hackett, a black male, began working for the Park and Recreation Board as Superintendent of Crafts in 1992. Brodie worked under Hackett's authority in 1995.

Until 1995, the Legion Field office did not employ any black employees on a permanent basis. According to Brodie, the events giving rise to this lawsuit did not take place until black employees were hired to work in the administrative office under Hackett's supervision on a permanent basis.[1] The permanent black employees hired to work with Brodie included Maxine Sheets, Brenda Sanders, and Karyl Cosey. Sheets began working for the Parks Operations office in March 1995 as an Administrative Clerk. Sanders was hired in July 1996 to replace Sheets. Cosey began working for the Parks Operations office in 1996 as Superintendent of Crafts.[2] Brodie alleges that after these black employees were hired to work on a permanent basis in the Park Operations office, Hackett and the other black employees began to treat her less favorably than the other employees. Specifically, Brodie testified that after she was given the responsibility of managing the office when Hackett was absent, the black employees showed hostility towards her on a continuous basis.

According to Brodie, Sheats and Cosey began discriminating against her and harassing her as soon as they started to work at the Parks Operations office. Brodie asserts that the three black women would ignore her and would not respond to her when she spoke to them. Sheats allegedly yelled at Brodie on a regular basis and called Brodie "stupid" at least once. Brodie also accuses

---

[1] Prior to 1995, the only black employees working in the administrative office were temporary employees. Brodie asserts that Hackett did not treat her unfairly or unfavorably during the time that black employees worked in the office on a temporary basis.

[2] Cosey did not have a supervisory role over Brodie.

2

Sheats of making racial statements to her such as "If you are not dark enough, you don't relate," "No one like you will ever tell me what to do," and "Someone like you will never tell me what to do. You will never be my boss." On one occasion, Cosey forcefully pushed Brodie out of the way when Brodie attempted to speak to Cosey. Cosey also allegedly snatched items out of Brodie's hands. Cosey and Sheats often wadded up and threw away office notes and memoranda given to them by Brodie before reading them. Brodie also complains that she was not invited to a Christmas party organized by Cosey and several others.[3] Sheats also apparently taunted Brodie by refusing to open the door to the office to let Brodie in when she was locked out and parked in Brodie's assigned parking space.[4]

Brodie testified that Hackett sometimes witnessed the hostile treatment of her by the black employees. Brodie began complaining of the "unfair and hostile treatment" to Hackett in April 1996. According to Brodie, she complained to Hackett on at least fourteen occasions.[5] However, Brodie did not mention race as a factor in her complaints until her December 1996 grievance regarding the

---

[3] The facts show that the Christmas party was organized by Cosey and persons in other departments, some of whom were white. The party was originally scheduled for one date but was then rescheduled and attendees were required to pay in advance. Flyers were evidently posted for the party. Brodie, however, asserts that she was intentionally left out of the party and was not personally told of the change of date. Although the party may not have been exceedingly organized, there is no evidence that Cosey or any of the other party planners intentionally excluded Brodie on the basis of her race.

[4] Brodie reported the parking space problem to Hackett. Hackett met with the employees and told them to park in their own spaces. According to Brodie, Sheats parked in Brodie's space again the day after this conversation with Hackett.

[5] Brodie filed a grievance with Hackett on December 13, 1996 in which she stated, "I have been discriminated against in my office at Gate 12, Legion Field. Please see attached." The attachment mentioned only the Christmas party incident. The City did investigate this incident, although Brodie claims that a thorough investigation was not done.

3

Christmas party. The issue of race discrimination was raised during an investigational meeting with Brodie in early 1997.[6] During the meeting, Brodie gave an explanation of the allegedly hostile treatment that she had been experiencing at work. Although Hackett's supervisor, Melvin Miller, stated that action would be taken to correct the problem of alerting all employees of company events, Brodie contends that the hostile treatment continued.

As a result of Brodie's December 13, 1996 grievance, Brodie contends that Hackett began treating her in a retaliatory manner. Hackett allegedly began reprimanding Brodie in front of other employees, refused to allow her to use vacation time in lieu of sick time, and "treated the plaintiff as if he was harboring anger towards her."

Brodie filed her EEOC claim on May 8, 1997 and filed her federal lawsuit on November 26, 1997. Brodie claims that she was subjected to a racially hostile working environment and retaliation in violation of Title VII and § 1983.[7]

## Analysis

### I. Title VII - Hostile Work Environment

Title VII prohibits an employer from discriminating against an employee with respect to his compensation, terms, conditions or privileges of employment because of that employee's race. See 42 U.S.C. § 2000(e). When an employee complains of being subjected to a hostile work environment under Title VII, the employee must show that the "workplace is permeated with 'discriminatory

---

[6] Those persons in attendance at the meeting included Pat George, President of the Birmingham Association of City Employees, Hackett, Brodie, and Melvin Miller, Hackett's supervisor.

[7] The Complaint asserts Title VII claims for hostile work environment and retaliation against the City and a § 1983 claim against Hackett in his individual capacity.

4

intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65-67 (1986)). Conduct that is isolated or genuinely trivial is not enough to rise to the level of hostile work environment. Title VII protects employees from only those actions that are severe and pervasive enough to create an objectively hostile or abusive work environment. See Harris, 510 U.S. at 21.

A plaintiff must prove intentional discrimination by showing either direct or circumstantial evidence. Direct evidence of discriminatory intent is found in such actions as a decisionmaker's discriminatory remarks made in the context of an employment decision. See Walker v. Nationsbank of Florida, 53 F.3d 1548, 1555 (11th Cir. 1995). Here, Brodie has not presented any direct evidence of discrimination. Intentional discrimination may also be shown by presenting circumstantial evidence under the burden-shifting model of McDonnell Douglas and Burdine. See McDonnell Douglas Corp. v. Green, 411 U.S. 293 (1973); Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981). In order to present a prima facie case of hostile work environment under Title VII using circumstantial evidence, a plaintiff must show that (1) she is a member of a protected group, (2) she was subjected to racial harassment, (3) the harassment occurred because of her race, (4) the harassment affected the terms, conditions or privileges of her employment, and (5) grounds to hold the employer liable. See Henson v. City of Dundee, 682 F.2d 897, 903-05 (11th Cir. 1982). Brodie's discrimination claim centers on allegedly racially motivated actions of her black co-workers and supervisor and the City's alleged failure to respond to the harassment.

It is clear that Title VII prohibits discrimination against both white and black persons. See Parr v. Woodmen of the World Life Ins. Co., 791 F.2d 888, 891 (11th Cir. 1986). Therefore, the first

5

element of Brodie's prima facie case is met. However, Brodie fails to show the four other elements of her prima facie case. Brodie has simply not presented any evidence, direct or circumstantial, that she was subjected to a *racially* hostile work environment. Brodie alleges that she was ignored by black co-workers, not invited to the company Christmas party and treated unfairly. While Brodie has shown that she and her co-workers did not necessarily enjoy an amiable work relationship and that she perhaps suffered from hurt feelings, she has not shown that any treatment she encountered occurred *because of* her race. Federal law does not protect employees from any and all unfair treatment in the workplace. "The employment discrimination law . . . cannot be transformed into a palliative for every workplace grievance, real or imagined . . . " Mora v. University of Miami, 15 F. Supp. 2d 1324, 1335 (S.D. Fla. 1998) (quoting Bristow v. Daily Press, Inc., 770 F.2d 1251, 1255 (4th Cir. 1985)). Although Brodie claims that she was ignored and treated discourteously by her black co-workers, "lack of eye conduct and shortness in conversation does not 'support a finding that the tension was related to racial differences.'" 1 Barbara Lindemann & Paul Grossman, Employment Discrimination Law 349 n.36 (3d ed. 1996) (quoting Triplett v. Electronic Data Sys., 710 F. Supp. 667, 672 (W.D. Mich. 1989), aff'd, 900 F.2d 260 (6th Cir. 1990)). Brodie simply has not shown that she suffered harassment because of her race or that the alleged racial harassment is severe or pervasive. At most, Brodie's claims are isolated and trivial and do not rise to the level of actionable racial harassment.

Further, there is no evidence that the employer knew or should have known of any alleged racial discrimination before her December 13, 1996 grievance letter in which she complained of being excluded from the company Christmas party. Hackett and Miller investigated the Christmas party complaint and took measures to assure Brodie that the department would make a better effort to

6

notify all employees of events to which they are invited. While Brodie did make numerous other complaints about work situations, which her employer apparently attempted to rectify, at no time did she ever assert race as a basis for the problems until the Christmas party complaint.

Even assuming that Brodie did present an actionable case of a racially hostile work environment, the defendants have offered legitimate, non-discriminatory reasons in response to her complaints. The defendants have presented a sufficient non-racial explanation as to why Brodie may not have known about the Christmas party. Further, the defendants have shown that Brodie did not provide notice of any alleged racial harassment until the December 1996 grievance. An employer is not responsible under federal law for assuring their employees an enjoyable and consistently amiable work environment. While employers are charged with preventing and addressing racial harassment, there is no evidence of such harassment here. The defendants' motion for summary judgment is due to be granted as to the plaintiff's Title VII hostile environment claims.

II. Title VII - Retaliation

A plaintiff alleging a retaliation claim under Title VII must establish a prima facie case by showing that (1) she engaged in statutorily protected activity, (2) an adverse employment action occurred, and (3) the adverse action was causally related to the plaintiff's protected activity. See Coutu v. Martin County Bd. of County Commissioners, 47 F.3d 1068, 1074 (11th Cir. 1995) (per curium). Although Brodie's complaint asserts only that her employer retaliated against her by reducing her office responsibilities, she further alleges in her summary judgment response brief that she was also retaliated against by Hackett when he did not allow her to use vacation time in lieu of sick leave, questioned her leave time, "chastised" her in front of other employees about opening a piece of his mail, and acted "angry" with Brodie on a regular basis, among other things. Brodie has

7

not shown, however, that she was subjected to any materially adverse employment action. As the Seventh Circuit has noted, "[A] materially adverse change in the terms and conditions of employment must be more than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by termination of employment, a demotion evidenced by a decrease in wage or benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." Rabinovitz v. Pena, Secretary of Transportation, 89 F.3d 482, 488 (1996). While Title VII does protect against retaliatory activities that materially affect job terms and conditions, it does not protect employees from any and all unfair treatment in the workplace. See Coutu, 47 F.3d at 1075. Although Brodie meets the first prong of the retaliation analysis, Brodie fails to show that she was demoted, paid less, or materially affected in terms of her job responsibilities in any way.

Even assuming that Brodie did present a prima facie case of retaliation, the defendants have presented legitimate and non-discriminatory reasons for the actions. The evidence shows that Brodie requested a lessening of some of her job duties prior to the filing of her EEOC complaint; she cannot complain now that her requests were met. Furthermore, a supervisor's questioning an employee concerning leave time and work performance, as well as his acting "uncomfortable," are not actions that rise to the level of retaliatory activity. Brodie also claims that Hackett did away with paying overtime leave to persons who worked through lunch as retaliation because she was the only employee who regularly worked through lunch. However, the new policy affected all employees similarly and Brodie has not shown that the action was causally related to her protected activity. Finally, Brodie claims that she was not allowed to use vacation time in lieu of sick time when a black employee was able to. Even assuming that Hackett's decision not to allow Brodie use her vacation

8

time constitutes a materially adverse employment action, the defendants have articulated a legitimate, non-discriminatory reason for the decision – Brodie did not ask for permission to use the vacation time as sick time until after she took the time off. According to the defendants, the black employee whom Brodie cites to in comparison asked to use his vacation time as sick time prior to missing work. Brodie has not shown that the defendants' reasons are pretexts for discrimination. As a result, Brodie's claim for retaliation is due to be dismissed.

III. § 1983 Claim against Hackett in His Individual Capacity

Section 1983 prohibits a state or municipality from depriving a plaintiff of her constitutional rights under color of state law. See 42 U.S.C. § 1983. State or municipal officials may also be sued in their individual capacities under §1983 when acting under color of state law. Although in individual capacity suits the plaintiff does not have to show the existence of an official custom or policy, the plaintiff does have to show that the official purposefully or intentionally discriminated against her. See Brown v. City of Ft. Lauderdale, 923 F.2d 1474, 1478 n.8 (11th Cir. 1991) (internal citations omitted). Because § 1983 is remedial and does not create any substantive rights, a plaintiff must claim a deprivation of a federally protected right in order to provide a basis for her § 1983 claim.

Here, Brodie asserts that Hackett violated her Fourteenth Amendment equal protection rights by not preventing his subordinates from harassing her. Brodie also asserts that Hackett himself racially discriminated and retaliated against her after she filed her EEOC charge.[7] However, as with

---

[7] The plaintiff's complaint does not specifically delineate which constitutional rights the defendants allegedly violated. Although Brodie provides a substantive argument that her Fourteenth Amendment equal protection rights were violated, Brodie also makes an allegation that her due process rights were violated. However, Brodie does not provide any support or explanation as to the due process claim. Therefore, to the extent that the plaintiff intended to assert a due process claim, the court finds that it is due to be dismissed. The court will address only the § 1983 equal protection claim.

9

the Title VII claim, Brodie has failed to present a prima facie case of discrimination or retaliation under § 1983.[8] Further, the defendant has articulated legitimate, non-discriminatory reasons for his actions. Hackett acted reasonably with regard to Brodie's complaint about the Christmas party. Further, there is no evidence that after filing her EEOC complaint, Hackett retaliated against Brodie of treated her discriminatorily because of her race. While Brodie's feelings may have been hurt, there is no evidence to support a finding that Hackett's actions or inactions were intentional or racially motivated. The defendant's summary judgment motion is due to be granted as to the § 1983 claim.

Conclusion

For the foregoing reasons, the court finds that the defendants' summary judgment motion is due to be granted in full.

Date: _May 25_, 1999.

_____
Chief Judge Sam C. Pointer, Jr.

Service List:
>	Marvin Stewart, Jr.
>	Stephanie Banks
>	Thomas Bentley, III
>	John M. Edens
>	Demetrius C. Newton
>	James D. Love
>	Kenneth J. Robinson
>	Clarence M. Small, Jr.

---

[8]Title VII and § 1983 race discrimination and retaliation claims are analyzed under the same McDonnell Douglas burden-shifting standard. See Harris v. Shelby County School Bd., 99 F.3d 1078, 1082-83 (11th Cir. 1996); Lee v. Mobile County Commission, 954 F. Supp. 1540, 1545 (S.D. Ala. 1995) (citing Turned v. AmSouth Bank, N.A., 36 F.3d 1057 (11th Cir. 1994)).